FILED'08 SEP 12 14:31 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Case No. 08-243-KI |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| JULIUS XAVIER HEXON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Karin J. Immergut
United States Attorney
District of Oregon
Gary Y. Sussman
Assistant United States Attorney
1000 S. W. Third Avenue, Suite 600
Portland, Oregon 97204

    Attorneys for Plaintiff

Kurt Muntz
Law Offices of Muntz & Ghio
3000 Market Street, NE, Suite 252
Salem, Oregon 97301

    Attorney for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Defendant Julius Xavier Hexon is charged with three counts of knowingly employing, using, inducing, enticing or coercing a minor to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct in violation of 18 U.S.C. § 2251(a) and (e), three counts of traveling in interstate commerce for the purpose of engaging in illicit sexual conduct with a minor in violation of 18 U.S.C. § 2423(b), and one count of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Before the court is his Motion to Suppress (#8). For the following reasons, I deny the motion.

## PROCEDURAL BACKGROUND

I previously denied defendant's Franks Hearing Request, filed contemporaneously with his Motion to Suppress. I concluded, after reading the parties' materials, that defendant failed to make the necessary preliminary showing that Detective Staples knowingly and intentionally included in his affidavit any false statement. Accordingly, I limited the issues to be presented at the evidentiary hearing on defendant's Motion to Suppress to whether defendant was in custody, whether he received Miranda warnings prior to questioning, and whether his consent to search the hotel room was voluntary.

The following facts were adduced at an evidentiary hearing on August 27, 2008.

## FACTS

I.  Government Witnesses' Testimony

The facts as reported by the government's witnesses Officer Gould and Corporal Mumey are as follows:

Salem Police Officer Gould interviewed a 16-year old girl, referred to here as KR, on November 3, 2007 at about 7:43 pm. She reported that she first met defendant, born in 1963,

Page 2 - OPINION AND ORDER

through a T-Mobile cellular telephone networking site, and that her profile on the site listed her age as 14. After she and defendant met through the networking site, they began talking on the telephone. KR said defendant knew her age from the beginning, and said he could not believe she was only 14. They spoke by phone several times a week for several months.

They met in March 2006 when defendant drove from California and rented a room at the Crossland Hotel in Salem. They had sex. She was 15. The two met again and had sex at the hotel in June and September 2006. He recorded their activities on his cell phone, which was capable of taking videos and photographs. On the victim's sixteenth birthday, in December 2006, defendant met her at the hotel, and again had sex. Defendant again recorded a video of their activities. Defendant returned in February and June 2007 to meet and have sex with the victim. The victim estimated the two had sex 50 to 70 times.

The victim informed Officer Gould that the defendant moved to Portland from California in July or August of 2007. After he moved, defendant again rented a room at the Crossland Hotel where he and the victim had sex again. Officer Gould sought rental records from the hotel, which show a "Xavier Hexon" from Industry, California stayed at the hotel in June, September, and November 2007. He attached these records to his police report.

The last time the victim saw defendant was on November 3, 2007 (the same day she reported the incident to Officer Gould) when she and defendant fought because defendant was seeing someone else. When she tried to get out of the car, defendant grabbed her arm and told her not to leave. She agreed to stay. They went to the hotel room, where the victim refused to have sex with him. She kept saying, "no," while he pulled her pants down. Defendant touched her genitals. Defendant apologized and gave her a ride home.

Page 3 - OPINION AND ORDER

After obtaining the victim's report, Officer Gould went to the hotel. He arrived at the hotel around 8:56 pm and obtained hotel records. Corporal Mumey arrived at 9:12 pm, and together they knocked on the hotel room door a little after 9:12 pm. They knocked only once.

Defendant answered within a normal amount of time, the uniformed officers identified themselves, and asked if they could come in. Defendant looked down, said "Oh, God," stepped away from the door and told the officers to "Come in." Officer Gould testified that defendant was a suspect and would have been arrested had he refused to speak to them.

Officer Gould told defendant they needed to talk about KR. Officer Gould asked defendant to sit, and the officer sat in a chair in front of defendant about three or four feet away, and asked defendant about his relationship with KR. The door was behind defendant's right shoulder.

Corporal Mumey was standing in the room by the dresser. He does not remember the temperature in the room being hot. He remembers getting defendant a glass of water. He did not say anything during the questioning. He did not hear the Miranda warnings or see defendant sign the cards. He was the supervisor on duty that night, came in and out of the room, and was mostly on the balcony outside of the room taking calls.

Officer Gould says he immediately gave defendant Miranda rights by reading them from a printed card he had in the pocket of his shirt. Defendant stated he understood his rights and signed the card. There is no place on the card calling for the time.

Defendant reported that he met the victim about two years before through a T-Mobile profile page, and that she listed her age as 19 and looked older than that. He said he traveled to Oregon in March of 2006, but did not have sex with her. He admitted having sex with her on later trips, but that he did not know how old she was until December of 2006, when it was her

Page 4 - OPINION AND ORDER

16th birthday. He denied trying to force her to have sex with him on November 3, 2007, but admitted that her pants were down and that he touched her. He said she liked it.

At 10:11 pm Officer James Donner arrived to replace Corporal Mumey, who left at 10:22 pm.

When Officer Gould spotted a bottle of personal lubricant on the dresser in plain sight, he asked for consent to search the room for condoms and items on defendant's cell phone. Defendant agreed and signed a written consent to search form. In the place where the card called for the time, Officer Gould wrote 22:41 (or 10:41 pm). Officer Gould seized a bottle of personal lubricant, defendant's Sprint "Pocket PC" cellular telephone, and some CDs and DVDs from the hotel room. Officer Gould estimated that he asked defendant for consent to search approximately one and a half hours after giving defendant his Miranda warnings.

Officer Gould asked defendant if he had pictures of the victim on his phone. Defendant said probably, and showed the officer where they were located. There were numerous sexually explicit pictures and videos of the victim, and some of the defendant and victim together. There were also videos of the victim in a room that appeared to be in defendant's apartment.

When Officer Gould saw the videos on the cell phone, around 11:06 pm, defendant was arrested and charged with several state sex offenses.

While defendant was sitting in the back of the patrol car, Officer Gould searched defendant's car. Defendant was handcuffed and the door to the patrol car was closed, but the back window was open. The officers would have heard defendant had he limited or revoked his consent to search. Defendant asked the officers to retrieve some CDs from the car. A bottle of Viagra was seized from a duffel bag in defendant's car.

The case was assigned to Salem Police Detective Staples. Detective Staples sought a search warrant to search defendant's apartment and his cell phone, which was in police custody. A Marion County Circuit Court judge signed the warrants on November 7, 2007.

Salem Police detectives executed the warrants the same day they were signed, and found and seized computer equipment and data storage media, miscellaneous documents (such as travel and hotel records), two cell phones, 13 VHS tapes, and the victim's high school identification card. Police found numerous photos and videos of the victim engaging in sexually explicit conduct on the computer and cell phone.

## II. Defendant's Testimony

The facts according to defendant are as follows:

Defendant testified that at 8:43 pm he listened to a voicemail that KR had left at 6:30 pm saying her mother had called the police. Since it had been several hours since she left the message, he did not expect the police. About ten minutes later, he heard several knocks on the door, but when he looked out the window no one was there. He went back to bed. He heard a knock again. When he looked out the window, he saw a police officer with an aggressive look in his eyes motioning defendant to open the door. When defendant opened the door, Officer Gould asked him, "Are you Javier?" mispronouncing Xavier, and asking if defendant knew KR. Defendant thought at that moment that KR had hurt herself, and he stepped back and said, "Oh, God." He did not say, "Come in." Officer Gould said, "I need to talk to you."

Officer Gould told defendant, "I need you to sit down," and motioned to a chair right next to the door. Officer Gould sat facing defendant two to three feet away. Corporal Mumey stepped inside, commented on how hot it was in the room, turned off the heater, flung open the window and stood in the open doorway.

Page 6 - OPINION AND ORDER

Defendant stated repeatedly that he could not go through this, and they should just arrest him. Both officers informed defendant that they were not there to arrest him. Corporal Mumey handed defendant some water. After defendant repeatedly stated he could not go through this, Corporal Mumey said in an intimidating fashion, "So, you don't want to give a statement?" Defendant felt intimidated. He felt he could not ask the officers to leave. He felt he could not leave himself.

He claims a little before 11:15 pm, Officer Gould asked him to consent to search. Defendant signed the consent to search form. Officer Gould gave defendant his <u>Miranda</u> rights, and looked in his pocket for a <u>Miranda</u> rights card for defendant to sign but realized he did not have one. An officer the defendant had not seen before entered the room with the <u>Miranda</u> rights card, and that is when defendant glanced at the hotel clock thinking it must be a shift change. The clock said 11:15 pm. He concedes hotel clocks are not always accurate. He says he signed the <u>Miranda</u> rights card at that point.

He was then arrested.

In questioning by the prosecutor about his past experience with <u>Miranda</u> rights, defendant initially asserted that he had never been previously arrested. When confronted with his record reflecting an arrest, he stated he spent the night in jail and was released the following morning.

## DISCUSSION

I. <u>The Defendant was not in Custody</u>

A key factual dispute is whether Officer Gould gave defendant <u>Miranda</u> warnings before or after he questioned him.

As an initial matter, however, Officer Gould's

> obligation to administer Miranda warnings attaches only where there has been such a restriction on a person's freedom as to render him in custody. Whether a suspect is in custody turns on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position.

United States v. Crawford, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (internal quotation marks, citations, and alterations omitted).

The determination of whether a person is in custody is based on the totality of the circumstances. Factors to be considered in the analysis include "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001), cert. denied, 122 S. Ct. 1117 (2002). Interrogation is "either express questioning or its functional equivalent"' and includes statements or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985) (quotations omitted). An officer's subjective, but undisclosed, view about whether the person being interrogated is a suspect is irrelevant to the analysis of whether the person is in custody. Stansbury v. California, 511 U.S. 318, 319 (1994).

Defendant's testimony was not as credible as the testimony offered by Officer Gould and Corporal Mumey. Defendant made several questionable statements about not knowing the police were on their way, even though he had received a phone call from KR warning him of the report to the police. He stated he could not see who was knocking on the door because it was dark out, but the officers testified credibly about the lights on the hotel balcony. When defendant opened

Page 8 - OPINION AND ORDER

the door and saw the police, he testified his first thought was that KR had hurt herself, but he never testified that he asked any questions about what had happened. In addition, he initially lied about a previous arrest.

Nevertheless, for purposes of resolving this portion of defendant's motion, I will accept his testimony. After examining the factors set forth above, I conclude defendant was not in custody and, therefore, the police were not required to give defendant his Miranda rights prior to questioning.

I examine first the language used to summon defendant. Defendant was not summoned to a police station, but rather voluntarily allowed the uniformed officers to enter after they asked if he knew KR and announced that they needed to talk to him. He stepped back into the room and said, "Oh, God." He did not shut the door, and he did not refuse entry in any other way. He was told he was not under arrest. He did not refuse to answer questions. The fact that defendant allowed officers in his hotel room, "understanding that questioning would ensue[,]" is an indication that the situation is non-custodial. United States v. Kim, 292 F.2d 969, 974 (9th Cir. 2002) (emphasis omitted).

With regard to the second factor, Officer Gould did confront defendant with evidence of guilt when he asked about defendant's relationship with KR at the beginning of the interview. Officer Gould did not, however, refer to any of the details reported by KR, did not press for information, and did not use intimidation or fear to obtain further information. Defendant testified that he said, "I can't go through with this," and that he wanted to be arrested. The officers assured him he was not going to be arrested, and Corporal Mumey gave him some water. Corporal Mumey allegedly said, "So, you don't want to give a statement?" Standing alone there

Page 9 - OPINION AND ORDER

is nothing intrinsically threatening about this statement and instead it provides an invitation to defendant to refuse to give a statement.

Third, defendant was questioned in his hotel room, not in a police interrogation room. The surroundings were familiar and he was not "isolat[ed] . . . in unfamiliar surroundings 'for no other purpose other than to subjugate the individual to the will of his examiner.'" Beckwith v. United States, 425 U.S. 341, 346 n. 7 (quoting Miranda v. Arizona, 384 U.S. 436, 457 (1966)). Although Corporal Mumey entered the room to turn off the heater, and open the window and the door, this is not the kind of activity that could be said to create a "police-dominated atmosphere." Kim, 292 F.3d at 977-78 (defendant with limited English was kept physically isolated from family members). There were only two officers, one of whom was in and out of the room. They did not lock the door. In fact, according to defendant's testimony, they left the door open. Finally, although Officer Gould directed defendant to have a seat, defendant testified that he felt ill and may have looked ill to the officers who suggested he sit.

Fourth, the duration of the questioning was lengthy. If the defendant's testimony is accepted, questioning began around 8:53 pm and he was read his Miranda rights at 11:15 pm. This was not a brief inquiry. On the other hand, a three-hour "friendly" and "relaxed" interview with IRS agents about the suspect's income tax liability did not rise to the level of a custodial interrogation. Beckwith, 425 U.S. at 347. Here, although defendant did not describe his experience as "friendly" and "relaxed," he did not describe either of the officers pressing for answers, or any other coercive behavior. Rather, the evidence reflects that defendant and Officer Gould had a conversation for a little over two hours, where defendant volunteered information about his relationship with KR.

Finally, there is no evidence that either of the officers used any pressure to detain defendant. Neither officer drew a gun, made a display of force, or pushed the door open into the hotel room. Defendant made no move to close the door on them, and did not ask why they were there.

Viewing the totality of the circumstances, defendant was not in custody. Although the questioning was lengthy, which makes the interview more like a custodial interrogation, no guns were drawn, defendant was not put in handcuffs, he was not held in a police car, he invited the officers in, he was never told he could not leave, and he was never pressed to answer questions. In fact, he was told repeatedly that he was not under arrest. The totality of the circumstances shows that a reasonable person would have believed he could end the interview. As a result, no Miranda warnings were required.

## II.     The Defendant Received Miranda Warnings Prior to Questioning

Even if I concluded defendant was in custody at the time of the questioning, Officer Gould's police report and his testimony reflect that he gave defendant his Miranda rights by reading from a printed advice of rights card at the beginning of the interview. The evidence also shows that defendant understood his rights and signed the card before he was questioned.

As I concluded above, defendant's testimony was not as credible as Officer Gould's testimony. Although it is somewhat troubling that Corporal Mumey testified he was inside the room standing by the dresser at the beginning of the interview and did not hear the Miranda warnings, when Officer Gould testified he gave the warnings right away, Corporal Mumey testified credibly that he was in and out of the room taking calls that night. It is entirely possible he was in the room at the time Officer Gould directed defendant to have a seat, and then left immediately thereafter. The fact that defendant asked to be arrested rather than talk is consistent

Page 11 - OPINION AND ORDER

with Officer Gould having given the Miranda warnings since being read the rights might trigger the possibility of arrest in defendant's mind. Additionally, since Officer Gould testified that he viewed defendant as a suspect and expected to arrest him, he would naturally give the warnings at the outset of the interview.

In sum, the evidence supports the conclusion that defendant was given his Miranda warnings at the outset of the interview. Accordingly, neither his statements nor the warrants based on his statements is subject to suppression.

III.     The Search was Constitutional

Defendant does not dispute that he signed a consent to search form. He makes no argument that the search occurred prior to Officer Gould asking for consent to search. He makes no argument that his consent was involuntary.

Whether consent was voluntarily given "is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). The Ninth Circuit looks at five guidelines:

> (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.

Rodriguez-Preciado, 399 F.3d at 1126.

Officer Gould read a printed consent to search form, which stated that defendant may refuse to give consent. Defendant gave the officer consent, and signed the consent card. Defendant was not in custody. No display of force was made, he was told he could refuse to consent, and no one said a search warrant would be obtained. Furthermore, after he signed the consent to search form, he voluntarily assisted Officer Gould in accessing the videos and pictures

Page 12 - OPINION AND ORDER

on his cell phone. There are no facts from which the Court could conclude defendant's consent to search was involuntary.

IV.     The Affidavit is Supported by Probable Cause

Defendant obliquely argues that "the warrants were issued with insufficient facts to support a determination that probable cause existed." D.'s Mem. at 5. He also makes two specific arguments. First, he asserts the warrants did not indicate if the issuing judge found the objects of the search related to an offense committed or triable within the district of Marion County. Second, he contends the two warrants indicate each warrant was received by Detective Staples on November 6, 2007, but the warrants were not signed by the Marion County Judge until November 7.

A search warrant must be supported by probable cause. The question is whether, viewing the totality of the circumstances, the judicial officer who issued the warrant had a substantial basis for finding that there was a "fair probability that contraband or evidence of a crime" would be found in the place searched. Illinois v. Gates, 462 U.S. 213, 238 (1983). The issuing court is entitled to draw reasonable inferences about where evidence may be kept, "based on the nature of the evidence and the type of offense." United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986). In "borderline cases, preference will be accorded to warrants and to the decision of the magistrate issuing it." United States v. Terry, 911 F.2d 272, 275 (9th Cir. 1990).

Even if the warrant is based on insufficient probable cause, the evidence need not be suppressed if the officer relied in good faith on the validity of the warrant, and his reliance was objectively reasonable. United States v. Leon, 468 U.S. 897, 922 (1984).

I agree with the government that there is substantial evidence supporting a finding of probable cause. The affidavit included the victim's statements to Officer Gould and to Detective

Page 13 - OPINION AND ORDER

Staples about her age and sexual activities with defendant, as well as a discussion about the videos of her, the defendant's statement to Officer Gould about knowing the victim was 16 when they had sex, Officer Gould's observation of the video clips, confirmation of defendant's residence, and information about computers and the commission of sexual offenses.

As for defendant's arguments about jurisdiction and timing, the government explains that the warrant to search the cell phone was for property held in police custody in Marion County. The warrant to search defendant's apartment in Portland was pursuant to ORS 133.545(2) which allows the execution of a search warrant outside the judicial district "if the judge finds from the application that one or more of the objects of the search relate to an offense committed or triable within the judicial district in which the court is located." The affidavit refers to state sex offenses which were committed at the Crossland Hotel in Marion County. As a result, the search of defendant's apartment in Portland complies with state law. Furthermore, in a federal criminal prosecution, evidence seized in compliance with federal law is admissible without regard to any violation of state law. United States v. Becerra-Garcia, 397 F.3d 1167, 1173-74 (9th Cir. 2005).

As for the error on the search warrant returns indicating they were issued on November 6, when they were issued November 7, the government argues the date on the warrants controls, and a scrivener's error on the returns (which were filled out after the warrants were issued and executed) does not invalidate otherwise valid warrants. I agree.

The warrants are supported by probable cause and the two small errors pointed out by defendant do not undermine their validity.

## CONCLUSION

For the foregoing reasons, defendant Julis Xavier Hexon's Motion to Suppress (#8) is denied.

IT IS SO ORDERED.

Dated this ___12___ day of September, 2008.

_____
Garr M. King
United States District Judge

Page 15 - OPINION AND ORDER